IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIM. NO. 05-0362JMS |
| | ) | |
| Plaintiff, | ) | |
| | ) | Hearing Date: 2/13/06 at |
| vs. | ) | 10:00 a.m., before the |
| | ) | Hon. J. Michael Seabright, |
| MICHAEL RAYMOND NIELSEN, | ) | U.S. District Judge |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**MEMORANDUM IN OPPOSITION TO DEFENDANT'S
MOTION TO SUPPRESS EVIDENCE**

**TABLE OF CONTENTS**

**TABLE OF AUTHORITIES**

EDWARD H. KUBO, JR. 2499
United States Attorney
District of Hawaii

MICHAEL K. KAWAHARA 1460
Assistant U.S. Attorney
Room 6-100, PJKK Federal Building
300 Ala Moana Blvd.
Honolulu, Hawaii  96850
Telephone:  541-2850
Facsimile:  541-2958
mike.kawahara@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

Table of Contents

                                                         Page(s)

Table of Authorities . . . . . . . . . . . . . . . . . . i-iii

I.    OVERVIEW OF CASE . . . . . . . . . . . . . . . . . . 1

II.   RELEVANT FACTS TO BE ESTABLISHED AT THE
      SUPPRESSION HEARING . . . . . . . . . . . . . . . . . 3

      A. CI information provided by DEA Special Agent
         Alznauer prior to August 11, 2005 and other
         historical information known to HAFT officers . . . . 3

      B. CI information received from Agent Alznauer on
         August 11, 2005 . . . . . . . . . . . . . . . . . . 6

III.  WHAT STARTED AS A CONSENSUAL ENCOUNTER WITH DEFENDANT
      SHORTLY TURNED INTO AN INVESTIGATIVE DETENTION BASED
      UPON REASONABLE SUSPICION TO BELIEVE THAT DEFENDANT
      WAS IN POSSESSION OF ILLEGAL DRUGS . . . . . . . . . . 16

IV.   DEFENDANT'S CONSENT TO SEARCH HIS PICKUP TRUCK,
      GIVEN AFTER HE INITIALLY REFUSED AND HAD TIME TO
      RE-EVALUATE THAT INITIAL DECISION, WAS VOLUNTARY . . . 21

V.    ALTERNATIVELY, THE SEARCH OF DEFENDANT'S PICKUP
      TRUCK WAS SUSTAINABLE AS A WARRANTLESS AUTOMOBILE
      SEARCH BASED UPON PROBABLE CAUSE . . . . . . . . . . . 23

VI.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . 31

Table of Authorities

Cases                                                          Page(s)

California v. Carney,
    105 S.Ct 2066 (1985) . . . . . . . . . . . . . . . . . 25

Devenpeck v. Alford,
    543 U.S. 146 S.Ct 588 (2004) . . . . . . . . . . . . . 23

Florida v. Bostick,
    111 S.Ct 2382 (1991) . . . . . . . . . . . . . 17, 27, 28

Florida v. Royer,
    __ U.S. __, 104 S.Ct 1319 L.Ed.2d 229 (1983) . . . . . . 17

Illinois v. Gates,
    462 U.S. 213 (1983) . . . . . . . . . . . . . . . . . 26

Pennsylvania v. Labron,
    116 S.Ct 2485 (1996) . . . . . . . . . . . . . . . . . 24

Schneckloth v. Bustamonte,
    412 U.S. 218 (1973) . . . . . . . . . . . . . . . . . 21

Sokolow v. United States,
    109 S.Ct 1581 (1989) . . . . . . . . . . . . . . . . . 19

United States v. $22,474.00,
    246 F.3d 1212 (9th Cir. 2001) . . . . . . . . . . . . 30

United States v. $25,000 U.S. Currency,
    853 F.2d 1501 (9th Cir. 1988) . . . . . . . . . . . . 17

United States v. Alpert,
    816 F.2d 958 (4th Cir. 1987) . . . . . . . . . . . . . 28

United States v. Ayarza,
    874 F.2d 647 (9th Cir. 1989) . . . . . . . . . 19, 21, 27

United States v. Ayon-Meza,
    177 F.3d 1130 (9th Cir. 1999) . . . . . . . . . . . . 17

United States v. Bagley,
    772 F.2d 482 (9th Cir. 1985) . . . . . . . . . . . . . 25

United States v. Cooper,
    949 F.2d 737 (5th Cir. 1991) . . . . . . . . . . . . . 3

i

Cases                                                              Page(s)

United States v. Erwin,
        803 F.2d 1505 (9th Cir. 1986)  . . . . . . . . . 19, 21, 27

United States v. Gomez-Genao,
        267 F.3d 1 (1st Cir. 2001) . . . . . . . . . . . . . . . 3

United States v. Gonzalez-Rodriguez,
        239 F.3d 948 (8th Cir. 2001) . . . . . . . . . . . . . . 4

United States v. Hamilton,
        792 F.2d 837 (9th Cir. 1986) . . . . . . . . . . . . . 25
United States v. Johns,
        469 U.S. 478 (1985)  . . . . . . . . . . . . . . . 25, 26

United States v. Low,
        887 F.2d 232 (9th Cir. 1989) . . . . . . . . . . . 18, 19

United States v. Moralez,
        917 F.2d 18 (10th Cir. 1990) . . . . . . . . . . . . . . 4

United States v. Riley,
        927 F.2d 1045 (8th Cir. 1991) . . . . . . . . . . . . 28

United States v. Ross,
        456 U.S. 798 (1982)  . . . . . . . . . . . . . . . . . 24

United States v. Simmons,
        918 F.2d 476 (5th Cir. 1990) . . . . . . . . . . . . . 29

United States v. Trejo-Zambrano,
        582 F.2d 460 (9th Cir 1978),
        cert. denied, 439 U.S. 1005  . . . . . . . . . . . . . 26

United States v. Velarde,
        823 F.Supp 792 (D.Hawaii 1993),
        af'fd., 25 F.3d 848 (9th Cir. 1994)  . . . . . . . . 17, 18

<u>Cases</u>                                                    <u>Page(s)</u>

<u>United States v. Watson</u>,
    423 U.S. 411 (1976) . . . . . . . . . . . . . . . . 21

<u>United States v. Weber</u>,
    808 F.2d 1422 (11th Cir. 1987) . . . . . . . . . . . 26

<u>United States v. Woods</u>,
    720 F.2d 1022 (9th Cir. 1983) . . . . . . . . . . 16, 18

MEMORANDUM IN OPPOSITION TO DEFENDANT'S
MOTION TO SUPPRESS EVIDENCE

The United States of America hereby opposes defendant
Michael Nielsen's "Motion to Suppress Evidence" filed January 3,
2006.

I.  **OVERVIEW OF CASE**

Defendant Michael Nielsen has been charged in the Indictment
with possession with intent to distribute 500+ grams of a
mixture/substance containing a detectable amount of
methamphetamine, its salts, isomers and salts of its isomers.  On
August 11, 2005, this methamphetamine was recovered from
defendant's pickup truck, which was located in the parking lot at
Honolulu International Airport.  This charge related to
defendant's travel on that date from the mainland to Honolulu.
Plainclothes officers of the Hawaii Airport Task Force (HATF) had
received a tip that defendant would be traveling back on that
date in possession of methamphetamine and were awaiting his
arrival.  Officers observed defendant walk from the arrival gate
to the interisland parking lot area, where he got into his pickup
truck and then drove to a new location in closer proximity to the
assigned baggage claim area for his arriving flight.  Defendant
then sat in his pickup truck for about five minutes before
getting out and proceeding to the baggage claim area.  After
retrieving his checked-in luggage, a HATF officer approached and
consensually interviewed defendant.  Defendant initially refused
to give consent to search his truck; however, he then changed his

mind and gave consent.  During the ensuing search, the
methamphetamine was found under the passenger seat of his truck.
As described in the Agent's Affidavit to the Criminal Complaint
filed August 12, 2005 (Exhibit "A" to defendant's motion):

> 9.   This methamphetamine was packaged in five plastic
> bags.  The plastic bags themselves were hidden within three
> socks.  There was silver-colored duct tape affixed to these
> three socks.  When one of these socks was touched, it felt
> moist and damp.  It also appeared that this duct tape had
> recently been used to affix those socks to someone or
> something.
>
> 10.   An examination of defendant's lower body revealed
> the following: there were indentations and other marks on
> the skin along the outside of both of defendant's thighs,
> which had been formed by objects being affixed there and
> pressed into the skin for some length of time.  In addition,
> there were also generally parallel, silver-colored lines of
> adhesive residue along the outside of both of defendant's
> thighs.  Finally, in the cleft between defendant's buttocks,
> there was silver-colored adhesive residue present on his
> left cheek with threads hanging down.  All of this was
> indicative of a very recent external bodycarriage of
> contraband using duct tape.

In his motion, defendant has sought the suppression of this
methamphetamine, claiming that he never consented to the search
of his pickup truck and alternatively, if he gave consent, it was
"tainted" by his unlawful detention/arrest.  We contend that the
search of defendant's pickup truck was lawful for the following
reasons:

-<u>First</u>, at the outset, the officers initially engaged
defendant in a lawful, consensual encounter for which no Fourth
Amendment justification was necessary; this led to a lawful

2

investigative detention of his person based, at a minimum, upon reasonable suspicion;

-Second, defendant initially refused, then changed his mind and voluntarily gave verbal consent to search his pickup truck; or

-Alternatively, even assuming for the purposes of argument only that there was no consent to search, the officers could nevertheless lawfully search defendant's pickup truck on a non-consensual basis, namely, as a warrantless automobile search based upon probable cause to believe that it contained illegal drugs.

This memorandum will address these points in turn below.

## II.  RELEVANT FACTS TO BE ESTABLISHED AT THE SUPPRESSION HEARING

A.  CI information provided by DEA Special Agent Alznauer prior to August 11, 2005 and other historical information known to HATF officers:

During the early part of 2005, DEA Special Agent Jason Alznauer of the Hawaii High Intensity Drug Trafficking Area (HIDTA) had a confidential informant (CI) who was providing information about the methamphetamine trafficking activities of defendant Michael Nielsen (aka "Mickey").[1]  In April 2005, the CI

---

[1] As will be indicated herein, the CI is a mere tipster who provided information to DEA which was utilized for probable cause/reasonable suspicion purposes.  He/she is not a percipient witness to, nor a participant in, the crime charged against defendant in this case.  As such, his/her identity need not be disclosed.  See, e.g., United States v. Gomez-Genao, 267 F.3d 1, 2-3 (1st Cir. 2001), United States v. Cooper, 949 F.2d 737, 749-

had advised that defendant, accompanied by two other persons, would be traveling from Honolulu to Los Angeles on April 26, 2005, carrying with them money to purchase methamphetamine on the mainland and to externally bodycarry the drugs back on their return trip a few days later. Agent Alznauer's plan was to encounter them on their return trip, when they were supposed to be possessing the methamphetamine. However, on April 26, as they went through the security checkpoint at the Honolulu International Airport to board their outbound flight, TSA personnel discovered that defendant and his two travel companions (Frank Foster and Daniel McCane) were in possession of a large quantity of money; when Task Force Officer Kobayashi and another HATF officer responded, they discovered that defendant had about $11,000, Foster had about $6,000, and McCane had about $10,000 (the three individuals also displaying the money to the HATF officers). Defendant also related a rather suspicious story to the effect that he was traveling to Los Angeles to purchase a vehicle with the money. Neither defendant nor his travel companions were arrested, nor their money seized, at this time.

Three days later, on April 29, 2005, Agent Alznauer again saw and interviewed defendant, Foster, and McCane after their arrival at the Honolulu International Airport on an inbound

---

50 (5th Cir. 1991), United States v. Gonzalez-Rodriquez, 239 F.3d 948, 951 (8th Cir. 2001), United States v. Moralez, 917 F.2d 18, 19 (10th Cir. 1990).

flight from Los Angeles.  All three gave consent to search their persons and handcarried possessions.  No discernible contraband was found in their possession.

The CI subsequently advised Agent Alznauer that defendant had become spooked by the discovery of the money and encounter with HATF officers on the outbound trip and rather than risk being caught in possession of the methamphetamine on the return trip, defendant had left it in a vehicle parked at the Los Angeles Airport.  The CI thereafter also learned that defendant had found another person to courier the methamphetamine to Honolulu for him.

Sometime prior to August 2005, Agent Alznauer had relayed this information about the April 29 encounter with defendant and his companions, and the subsequent information provided by the CI to HATF officers, specifically, to DEA Agent Richard Jones.

Of further relevance to the instant case is the separate criminal case of USA v. Mark Nielsen, USDC-Hawaii Criminal No. 04-0264HG, which was also a methamphetamine trafficking case. Mark Nielsen is the brother of the defendant herein, and as indicated in court records, Mark Nielsen was sentenced by this Court in his criminal case on August 11, 2005, the very same day that defendant herein was arrested.

B.  <u>CI Information received from Agent Alznauer on August 11, 2005</u>:

On the morning of August 11, 2005, the CI advised Agent Alznauer that defendant was traveling back from Los Angeles to Honolulu on this date and that he would be transporting methamphetamine with him.  According to the CI, defendant was trying to get back to Honolulu in time for his brother's sentencing that afternoon, and due to this time constraint, defendant had been unable to get another person to courier the drugs for him.  The CI also said that defendant's <u>modus</u> <u>operandi</u> would be to externally bodycarry the drugs (i.e., carrying it under the clothes he was wearing).  In addition, the CI also advised that defendant had parked his green-colored pickup truck, Hawaii license plate #BU-226, in the open-air portion of interisland terminal parking lot at the Honolulu International Airport.

As Court records further indicate, Mark Nielsen's sentencing in <u>USA v. Mark Nielsen</u> was scheduled and actually occurred at 3:00 p.m. on August 11, 2005 before U.S. District Judge Gillmor. Agent Alznauer was also personally aware of this sentencing, because the <u>Mark Nielsen</u> case was the result of a HIDTA investigation.

Agent Alznauer then telephonically provided this information about defendant's likely bodycarrying of methamphetamine to Agent Jones of the HATF.  HATF officers were able to find defendant's

pickup truck, at the very parking lot location and with the same license plate number described by the CI.  Because Officer Kobayashi had previously been involved in the April 26 money incident (as described above) and could therefore identify him, this Officer would be encountering defendant.

The HATF officers were also able to ascertain that defendant was flying on ATA flight #4755, inbound from Los Angeles, with a scheduled arrival time of about 10:30 a.m.  Furthermore, according to ATA passenger reservation records, defendant had two pieces of checked-in luggage.

ATA flight #4755 arrived at Gate 21.  Officers Kobayashi, Nakasone, and Agent Jones (all attired in civilian clothing without any firearms visibly displayed) observed that defendant was the first person to deplane from the jetway.  Officers Kobayashi and Nakasone then followed defendant, who walked at an extremely fast pace from the gate area directly to the interisland terminal parking lot, without passing through baggage claim.  At the interisland terminal parking lot, defendant got into his parked pickup truck and headed in the direction of the overseas/mainland parking area.

Agent Jones was able to observe defendant park his pickup truck in the portion of the overseas/mainland parking area directly across the street from where the assigned baggage claim area for his ATA flight was located.  After parking, Agent Jones

7

saw defendant remain in the pickup truck for approximately five minutes.

Agent Jones telephonically advised Officer Kobayashi about locating defendant's truck and that defendant had been sitting in the truck for a while.

When Officer Kobayashi arrived, he saw defendant exit the truck and proceed into the assigned baggage claim area for his flight.

From the above-described conduct they observed and also knowing that he had checked-in luggage to claim, the officers got the impression that defendant had moved his truck to be in closer proximity to the baggage claim area, such that it would be more convenient and quicker for him to get his bags to the truck and depart from the airport.  It was somewhat curious, however, why defendant remained for an approximately five minute period in his truck before departing.

As defendant faced at the baggage claim carousel, as he waited for his luggage, Officer Kobayashi approached him on his left side.  The Officer displayed his HPD badge and identified himself as a police officer.  Officer Kobayashi also advised that he was the same officer who had interviewed him on a prior occasion when he had the money; defendant affirmed that he remembered the Officer and then reached down to retrieve his luggage from the carousel.  After he had retrieved his luggage,

8

the Officer advised defendant that he was not under arrest nor in any trouble and was free to go.  The officer also asked defendant for a minute of his time, and defendant assented.  Officer Kobayashi again reiterated that he was not in any trouble and asked if he and Officer Nakasone could search his checked-in luggage; to this request, defendant replied, sure, go ahead, or words to that effect.  The Officers then immediately searched both bags in defendant's presence, finding no contraband.  Each bag was heavy, weighing about 40 pounds, and they were filled with clothing and automobile parts and tools.  Officer Kobayashi thanked defendant for his cooperation.

While still in the baggage claim area, Officer Kobayashi then asked defendant how he would be leaving the airport. Defendant first said that he was going to be picked up and that his mother was coming.  Defendant then further said that he did not need a ride and asked the Officer where the nearest taxicab station was located.  Officer Kobayashi found these two responses by defendant to be highly suspicious: first, the two responses themselves, to the effect that he was to be picked up by someone else and that he needed a taxi, were mutually inconsistent; second, inasmuch as the defendant had his own transportation and furthermore, had already gone to considerable effort to re-position that pickup truck in a more convenient location, the Officer knew that both of defendant's responses were flat-out

lies.  Officer Kobayashi consequently wondered why defendant was attempting to hide the presence of his pickup truck at the airport.  A likely reason was that defendant had placed the drugs he was bringing back from the mainland in his pickup truck during that five minute interval he was sitting therein after parking in the new location.

Officer Kobayashi thereafter told defendant that he would direct him to the nearest taxicab stand, which was on the center island across the street from baggage claim.  After exiting from baggage claim, defendant placed his bags on the sidewalk and spoke on his cellphone; defendant, speaking in a loud voice, could be overheard saying that he was going to catch a taxi and that his mother did not need to pick him up.  In Officer Kobayashi's mind, defendant's actions here appeared to merely be a poorly improvised and "spur of the moment" attempt to conjure up a plausible explanation for his inconsistent responses.  Needless to say, such posturing did not in any way assuage the Officer's suspicions about defendant.

As they proceeded to the taxicab stand, Officer Kobayashi walked behind defendant and had the opportunity to telephonically advise Agent Jones (who was in the parking lot watching defendant's pickup truck) that defendant had no contraband in his luggage but that he was lying about how he was leaving the airport, that is, by initially saying he was going to be picked

10

up and then saying that he was leaving by taxi.  Officer
Kobayashi also pointed out that defendant wasn't saying anything
about his pickup truck.

At the taxicab station, defendant told the dispatcher that
he needed a cab; defendant also unsuccessfully tried to flag down
passing cabs.  Again, defendant's affirmative conduct here of now
attempting to get away from Officer Kobayashi heightened his
suspicions.  At this point, Officer Kobayashi again got in
telephonic contact with Agent Jones, and advised that defendant
was trying to leave the airport via taxi.  Agent Jones instructed
the Officer to detain defendant.

Agent Jones, who was already aware from Agent Alznauer's CI
tip that defendant was supposed to be bodycarrying illegal drugs
to Hawaii, and also knew that defendant had actually gone to and
sat in his pickup truck for about five minutes after re-
positioning it, now believed defendant had used that time to hide
the drugs in the truck.  This belief was reinforced by Officer
Kobayashi's latest information, because it appeared that
defendant did not want the Officer to know about the truck.
Agent Jones then told Officer Kobayashi to detain defendant.

After talking to Agent Jones, Officer Kobayashi told
defendant that he needed to pick up his bags and step away from
the curb.  Defendant inquired whether he was now being "detained"
(NOTE: defendant actually used this word), and the Officer

11

replied affirmatively.  Officer Kobayashi also advised defendant that he knew about his pickup truck parked nearby and that he did not need a taxi.  Defendant then said that he was on his way to his brother's sentencing and that he needed a taxi because his mother and everybody else would not fit in his truck.  Officer Kobayashi found defendant's explanation to be another convenient, but poorly improvised, lie because defendant had first talked about being picked up at the airport, specifically by his mother. More importantly, because defendant had very heavy checked-in luggage to carry (some 80 pounds), it was understandable why he had re-positioned his pickup truck in order to shorten the walking distance thereto.  In short, defendant's tales about leaving the airport by means other than this pickup truck made absolutely no sense.

Officer Kobayashi then asked that if that was the case, would he have a problem giving consent to search his truck.  At this point, defendant's attitude and demeanor-- which up to this point had been very cooperative and very cordial-- suddenly changed.  Defendant's immediate response was "fuck you, you're not searching my truck" (NOTE: this was also the first time that defendant used profanity).  In addition, defendant now became visibly nervous; he started looking around, his hands began to shake, his face became flushed, and he started to visibly perspire.  Defendant's visible and very significant change in

12

attitude after being asked for consent was very suspicious indeed.

At this time, another Task Force Officer arrived at the scene, and Officer Kobayashi advised that Officer and Officer Nakasone that he was going to leave and start on a search warrant for defendant's pickup truck. This conversation occurred within earshot of defendant. Officer Kobayashi then left with police dog handler to proceed to the pickup truck.

In the meantime, Agent Jones was watching the parked pickup truck. The dog handler had his narcotics detector dog examine the exterior of the pickup truck, and he subsequently advised that the dog did not alert on the truck.

However, the absence of a canine alert did not negate either Officer Kobayashi's or Agent Jones' suspicions. From their time on the HATF, both Officers knew that narcotics detector dogs are trained to "alert" to the odor emitted by illegal drugs; consequently, there must be an opportunity for the odor to be detectable in the first instance. Only a short period of time had elapsed since defendant had last been present in that truck, and it was possible that the odor of any illegal drugs which defendant had placed in the truck's interior had not yet diffused to the truck's exterior, such that it could be discerned by the canine. The bottom line is that based upon what the Officers then knew from their own observations, defendant's conduct during

13

the consensual interview, and the CI information provided by
Agent Alznauer, they still in good faith believed that there was
probable cause to search that pickup truck for illegal drugs.

Meanwhile, back at the taxi cab station, defendant was
standing next to Officer Nakasone (not handcuffed or physically
restrained in any way).  Out of the blue and not in response to
any questioning, defendant then volunteered that he would consent
to the search of his truck, as long as he could be present.
Officer Nakasone then advised Agent Jones on defendant's change-
of-mind via cellphone.  Defendant's decision to give consent
occurred no more than fifteen minutes after Officer Kobayashi had
detained him.

Agent Jones then came back to the taxicab stand to ascertain
whether defendant had voluntarily changed his mind about the
search of the pickup truck.  Defendant reiterated that it was
okay to search his truck but he wanted to be present.  Agent
Jones asked why he wanted to be present, and defendant said that
he wanted to make sure that his truck was not torn apart during
the search.  Agent Jones assured defendant that law enforcement
would not tear his truck apart, and defendant said that it was
okay.  Agent Jones then asked for his truck keys, and defendant
then handed them over to Agent Jones.

Agent Jones also engaged defendant in further conversation,
inquiring whether they were wasting their time by looking in the

14

truck.  Defendant said that there were only black pearls in the truck.  Agent Jones asked if it was illegal to have black pearls, and defendant said he didn't know.  Agent Jones then assured defendant that he would search the truck quickly and if the truck only contained black pearls, then defendant would soon be on his way.  Defendant replied okay.

Agent Jones also asked if he had beaten law enforcement that day, to which defendant chuckled and looked away.  Agent Jones also advised that he knew defendant was a drug dealer and that if defendant had "beaten" them today, they would catch him on the next one.  Agent Jones again asked whether they were wasting their time searching his truck, and defendant again chuckled. Agent Jones asked if he had beaten them, and defendant said yeah, I beat you, and both the Agent and defendant then laughed.  Agent Jones then told defendant that he would be back, and he left to conduct the search of the truck.

Once Agent Jones reassured defendant that he would not tear his truck apart and that he would be freed if only black pearls were found in the truck, defendant never renewed his earlier request to be present during the consent search.  Nor did defendant himself make any move to accompany Agent Jones when the latter left to conduct the consent search.

Agent Jones and Officer Kobayashi thereafter searched defendant's pickup truck (which was still parked in the airport

parking garage), using the key provided by defendant to unlock the driver's and passenger-side doors.  Hidden under the passenger seat were three socks with silver colored duct tape affixed to them.  Inside these socks were ziplock plastic bags containing a crystalline substance resembling methamphetamine. Defendant was thereafter arrested.

**ARGUMENT:**

III.  **WHAT STARTED AS A CONSENSUAL ENCOUNTER WITH DEFENDANT SHORTLY TURNED INTO AN INVESTIGATIVE DETENTION BASED UPON REASONABLE SUSPICION TO BELIEVE THAT DEFENDANT WAS IN POSSESSION OF ILLEGAL DRUGS**

Defendant has expressly conceded that his initial encounter and interview with Officer Kobayashi at baggage claim (during which time defendant's checked-in luggage was searched with his consent) was a consensual encounter.[2]  Moreover, defendant's

---

[2] As defendant represented at page 5 of his memorandum in support of his suppression motion:

> After observing Defendant move his truck to an area immediately across his baggage claim area, Officer Kobayashi approached Defendant at the baggage claim area.  Defendant consented to engage in conversation with Officer Kobayashi.  Defendant was cooperative and cordial.  Defendant even consented to a search of his two checked-in bags.

[emphasis added]

The leading Ninth Circuit case on "consensual encounters" is United States v. Woods, 720 F.2d 1022, 1026 (9th Cir. 1983), wherein it was said:

> Law enforcement officers do not violate the Fourth Amendment by approaching an individual in a public place and putting questions to him or her.  The person so questioned need not

16

awareness that he was free to leave was evidenced by his attempt
to catch a taxi and his direct question to Officer Kobayashi at
the taxicab stand whether he was now being "detained"
(defendant's own choice of words).

The more important question, therefore, is whether the
investigative detention of defendant, which occurred at the
taxicab stand, was proper.

---

> answer any questions and is legally free to ignore the
> officer or walk away.  His or her voluntary answers to the
> officer's questions are admissible in a criminal
> prosecution.  The fact that the officer identifies himself
> as a police officer does not 'convert the encounter into a
> seizure requiring some level of objective justification'.
> Florida v. Royer, __ U.S. __, 104 S.Ct 1319, 75 L.Ed.2d 229
> (1983)

The Ninth Circuit further stated in United States v. Ayon-Meza,
177 F.3d 1130, 1133 (9th Cir. 1999)–– another airport "walk and
talk" case at Honolulu International Airport–– that:

> [W]e must recognize that there is an element of
> psychological inducement when a representative of the
> police-- even unarmed and in civilian clothes, as [HPD
> Officer] Tano was-- initiates a conversation.  But it is not
> the kind of psychological pressure that leads, without more,
> to an involuntary stop.

> Accord, Florida v. Bostick, 111 S.Ct 2382, 2388 (1991)("no
> seizure occurs when police ask questions of an individual,
> ask to examine the individual's identification, and request
> consent to search his or her luggage-- so long as the
> officers do not convey a message that compliance with their
> requests is required"), United States v. $25,000 U.S.
> Currency, 853 F.2d 1501 (9th Cir. 1988), United States v.
> Velarde, 823 F.Supp 792 (D.Hawaii 1993), af'fd., 25 F.3d 848
> (9th Cir. 1994).

In <u>United States v. Low</u>, 887 F.2d 232, 235 (9th Cir. 1989), the Ninth Circuit said that:

> A temporary detention of a person is justifiable under the fourth amendment if there is reasonable, articulable suspicion that a person has committed or is about to commit a crime.[3]

In assessing the presence of reasonable suspicion, the Ninth Circuit cautioned in <u>Woods</u>, <u>supra</u>, that:

> A police officer's special training and experience may enable him reasonably to suspect that criminal activity is afoot from observing what might appear innocuous to the unitiated.[4]

In the instant case, the following factors gave rise to reasonable suspicion to detain defendant for drug trafficking at the time he was present at the taxicab stand:[5]

-<u>First</u>, from his earlier contact on April 26, 2005, Officer Kobayashi personally knew that defendant and his two cohorts had been transporting approximately $27,000 in cash from

---

[3] Like the instant case, <u>Low</u> involved a DEA Agent's decision to detain the defendant at Honolulu International Airport.

[4] Consistent therewith, this Court itself has said in <u>Velarde</u>, <u>supra</u>, 823 F.Supp at 798: "The courts afford considerable deference to the observations and conclusions of trained officers, reasoning that they are able to infer criminal activity from conduct that seems innocent to an untrained observer".

[5] While the legal argument in this section of our memorandum is limited to reasonable suspicion to detain, we will also be contending in succeeding portions of this memorandum that these same facts, coupled with a few additional factors arising after defendant's detention, gave rise to probable cause to search defendant's pickup truck.

Honolulu to Los Angeles, a highly suspicious activity in and of itself which was entirely consistent with how drug traffickers operate.  Had defendant really been involved in a legitimate activity (the so-called purchase of a vehicle on the mainland as he had claimed), there were more convenient and secure ways of having his money available, as <u>e.g.</u>, wire transfers of funds and other methods of interstate banking, <u>albeit</u> which left a detectable paper and record trail, an anathema to drug traffickers.  Moreover, it also did not make financial sense to have to pay the substantial travel costs associated with mainland travel for three separate persons merely to courier money to buy a truck.

-<u>Second</u>, that the trio was not in possession of any drugs when traveling back to Honolulu on April 29 did not detract from the overall suspiciousness of that short turnaround, three day mainland trip.[6]  Moreover, under the circumstances, the CI's explanation for why defendant did not have any drugs on the return trip was entirely reasonable, namely, that defendant did not want to take the risk due to the discovery of the money by

---

[6] Short turnaround trips have been held to give rise to reasonable suspicion to detain for drug trafficking.  <u>See, e.g.</u>, <u>Sokolow v. United States</u>, 109 S.Ct 1581, 1583-7 (1989), <u>Low</u>, <u>supra</u>, 887 F.2d at 235, <u>United States v. Erwin</u>, 803 F.2d 1505, 1506-7 (9th Cir. 1986), <u>United States v. Ayarza</u>, 874 F.2d 647, 651 (9th Cir. 1989).

19

the police when leaving for the mainland and that he had gotten someone else to courier the drugs back for him.

-Third, the latest tip from the CI, transmitted from Agent Alznauer to Agent Jones was that defendant would be bodycarrying illegal drugs to Hawaii on August 11, 2005 and that his pickup truck was parked at the airport.  Via checks made at the airport, HATF determined that defendant was actually traveling on that date on an ATA flight, and they actually found and identified defendant's truck, thus providing substantial corroboration of the reliability of the CI's tip.  In this connection, too, the CI's stated reason why defendant was unable to get a drug courier, namely, he had no time to do so because he had to get back to Hawaii for his brother's sentencing that afternoon, was also corroborated by Agent Alznauer's own awareness of that sentencing.

-Fourth, that defendant himself walked to the very truck identified by the CI also established the reliability of the information he/she provided.

-Fifth, defendant's affirmative lies about how he was going to leave the airport-- namely, that he was going to be picked up by his mother or someone else and then in direct contradiction thereto, that he was going to get a taxi-- was a

20

very obvious attempt to hide the presence of his pickup truck from the Officers.[7]

-Sixth, that defendant had sat in his pickup truck for an approximate five minute period after moving it to a more convenient location in the airport parking lot provided an opportunity for him to have placed his bodycarried drugs in the truck itself.

The bottom line is that there were ample grounds known to both Agent Jones and Officer Kobayashi to justify defendant's detention at the taxicab stand.

## IV. DEFENDANT'S CONSENT TO SEARCH HIS PICKUP TRUCK, GIVEN AFTER HE INITIALLY REFUSED AND HAD TIME TO RE-EVALUATE THAT INITIAL DECISION, WAS VOLUNTARY

Under Schneckloth v. Bustamonte, 412 U.S. 218 (1973), a consent search is proper if it is freely and voluntarily given and is not the result of duress or coercion. The voluntariness of the suspect's consent is to be determined by the totality of the circumstances. Furthermore, the suspect's knowledge of his right to refuse is not necessary for a valid consent. A suspect can still give a valid consent even though he/she is arrested or otherwise restrained at the time. United States v. Watson, 423 U.S. 411, 424 (1976).

---

[7] The implausibility of the defendant's responses during the consensual encounter may properly be considered in giving rise to reasonable suspicion to detain. See, e.g., Ayarza, supra, 874 F.2d at 651, Erwin, supra, 803 F.2d at 1506-7.

In the instant case, defendant was well-versed in his Constitutional rights.  He knew how to say "no" to a consent search request and actually said this in the instant case.  The question is whether his subsequent change-of-mind to permit a search of his truck, after hearing that the Officers intended to get a warrant, was voluntary.  We submit that it was, especially here, where defendant's decision to permit the search was entirely spontaneous and on his own initiative.  The circumstances quite clearly indicated that defendant realized the "jig was up" and it was only a matter of time before the Officers found the drugs in his truck pursuant to a search warrant, and he consequently felt it to be in his best interest at that time to be cooperative with the Officers.  There could hardly be a more voluntary consent to search.

It is true that defendant indicated to both Officer Nakasone and Agent Jones his desire to be present when the consent search occurred, also explaining to Agent Jones that his reason therefor was to insure that his truck was not torn apart during the search.  However, after Agent Jones reassured defendant that this would not happen, that the search would be quick, and that if only black pearls were present in the truck, that defendant would be released, defendant implicitly dropped this request. Defendant neither reiterated this request to be present after hearing Agent Jones' assurances, and most importantly, by his

22

affirmative conduct of handing over his truck keys and not making
any move to accompany the Agent when he left to perform the
search, defendant clearly demonstrated that he no longer needed
to be present.

In short, the search of defendant's pickup truck on a
consensual basis, which resulted in the discovery of the
methamphetamine and other relevant evidence, was proper.

V.  **ALTERNATIVELY, THE SEARCH OF DEFENDANT'S PICKUP TRUCK WAS
SUSTAINABLE AS A WARRANTLESS AUTOMOBILE SEARCH BASED UPON
PROBABLE CAUSE**

While Officer Kobayashi and Agent Jones were subjectively
conducting a consent search of defendant's pickup truck, we
submit that it was objectively reasonable for this same search to
have been properly conducted on a non-consensual basis, namely,
as a warrantless automobile search based upon probable cause.[8]

---

[8] It is entirely appropriate for the Court to objectively
rely upon an entirely different Constitutional theory to sustain
a search.  For example, in Devenpeck v. Alford, 543 U.S. 146, 125
S.Ct 588 (2004), a civil rights action for alleged false arrest,
the petitioner-police officers had arrested the respondent for
illegal tape-recording of their conversations, which was a state
privacy act violation.  The Supreme Court found that even though
there was no violation of the privacy act under the circumstances
of this case and no valid arrest therefor, there still
objectively could be probable cause to arrest the respondent for
the entirely separate state crime of impersonating a police
officer, which could have provided a complete defense to the
false arrest claim.  In the Supreme Court's words, 125 S.Ct at
594:

That is to say, his subjective reason for making the arrest
need not be the criminal offense as to which the known facts
provide probable cause.  As we have repeatedly explained,

23

In <u>United States v. Ross</u>, 456 U.S. 798 (1982), the Supreme

Court described the warrantless automobile search doctrine as

follows:

> We consider the extent to which police officers-- . . . who
> have probable cause to believe that contraband is concealed
> somewhere within it- may conduct a probing search of
> compartments and containers within the vehicle whose
> contents are not in plain view. <u>We hold that they may
> conduct a search of the vehicle that is as thorough as a
> magistrate could authorize in a warrant 'particularly
> describing the place to be searched'</u>. 456 U.S. at 800.
> [emphasis added]
>
> The scope of the warrantless search authorized by that
> [automobile] exception is no broader and no narrower than a
> magistrate could legitimately authorize by warrant.  If
> probable cause justifies the search of a lawfully stopped
> vehicle, it justifies the search of every part of the
> vehicle and its contents that may conceal the object of the
> search.
>
> 456 U.S. at 825.
>
> <u>Accord</u>, <u>Pennsylvania v. Labron</u>, 116 S.Ct 2485, 2487
> (1996)("If a car is readily mobile and probable cause exists
> to believe it contains contraband, the Fourth Amendment thus
> permits police to search the vehicle without more").

In <u>Ross</u>, the police discovered during the automobile search a

closed brown paper bag in the trunk, which after opening was

---

'the fact that the officer does not have the state of mind
which is hypothecated by the reasons which provided the
legal justification for the officer's action does not
invalidate the action taken as long as the circumstances,
viewed objectively, justify that action.

Using parallel logic herein, it is still entirely possible to
sustain a search which, even if it arguably did not constitute a
proper consent search, so long as another Fourth Amendment
justification would authorize the same.

found to contain heroin.  The Supreme Court held that this
warrantless search of the closed paper bag was permissible as
part and parcel of the automobile search.

The warrantless automobile search doctrine is based upon the
inherent mobility of vehicles and the reduced expectation of
privacy associated therewith and consequently, it applies to both
cars on the move on the highway and those which are stationery.
See, e.g., California v. Carney, 105 S.Ct 2066, 2068-71
(1985)(automobile search doctrine applied to a stationery mobile
home located in a parking lot), United States v. Bagley, 772 F.2d
482, 491 (9th Cir. 1985)("the existence of probable cause alone
justifies a warrantless search or seizure of a vehicle lawfully
parked in a public place"), United States v. Hamilton, 792 F.2d
837, 842-3 (9th Cir. 1986)(warrantless search of an unattended
motor home, parked in a private driveway of a residence, was
permissible as an automobile search).

Additionally, the fact that the police had the vehicle
"secured" at the time and arguably could have obtained a search
warrant therefor does not vitiate the automobile search doctrine.
In United States v. Johns, 469 U.S. 478 (1985), U.S. Customs
Agents had arrested all of the defendants and seized two trucks
at a remote private airstrip in Arizona.  The two pickup trucks
and their contents-- numerous packages wrapped in opaque, dark
green plastic-- were seized and taken to a DEA facility, where

25

the packages were removed from the trucks and secured within a
DEA warehouse.  Three days later, the packages were searched in
the DEA warehouse without a warrant and found to contain
marijuana.  The Ninth Circuit had ruled that given the time delay
and concomitant lack of urgency to search the packages already in
police custody, the warrantless automobile search doctrine was
inapplicable.  The Supreme Court disagreed, found that search was
sustainable under the automobile search doctrine, and reversed
the Ninth Circuit's ruling.  Consistent with <u>Johns</u>, other Federal
Courts have consistently held that the warrantless search may
occur any time after the initial seizure of the vehicle, even
after the police have removed it to another location.  <u>See, e.g.</u>,
<u>United States v. Trejo-Zambrano</u>, 582 F.2d 460, 463 (9th Cir
1978), <u>cert. denied</u>, 439 U.S. 1005 (vehicle not searched until
after police had it towed from the scene of defendant's arrest to
a service station), <u>United States v. Weber</u>, 808 F.2d 1422, 1425
(11th Cir. 1987)(closed briefcase recovered from defendant's
vehicle was not searched until after police had transported it to
another location).

In <u>Illinois v. Gates</u>, 462 U.S. 213 , 239 (1983), the Supreme
Court defined probable cause to search as being ". . . a fair
probability that contraband or evidence of a crime will be found
in a particular place".  We have already discussed the
information known to the Officers which gave rise to reasonable

suspicion to detain.  There was more than occurred after
defendant's detention.  Defendant's conduct subsequent to Officer
Kobayashi's request to search his pickup truck-- above and beyond
his verbal refusal to give consent-- further reinforced the
earlier suspicions that there was some kind of contraband present
in that truck which defendant did not wish Officers to find.  As
hereinbefore indicated, Officer Kobayashi had noted a very clear
change in defendant's attitude and demeanor after the Officer had
mentioned the pickup truck.  Whereas defendant had heretofore
treated Officer Kobayashi politely, he now profaned and cursed
him ("fuck you, you're not searching my truck") and now exhibited
hostility.  And most importantly, defendant was also visibly
nervous after Officer Kobayashi had expressed an interest in his
truck.[9]

The Supreme Court has noted in Bostick, supra, 111 S.Ct at
2387, that "a refusal to cooperate, without more, does not
furnish the minimal level of objective justification needed for a
detention or seizure". [emphasis added]  We concur that
defendant's verbal election to rely upon his Constitutional
rights and to refuse the consent search request cannot and should
not be used to establish reasonable suspicion/probable cause.
However, defendant's concomitant non-verbal conduct and

---

[9] Nervousness, in combination with other factors, can
properly give rise to reasonable suspicion to detain.  See, e.g.,
Ayarza, supra, 874 F.2d at 651, Erwin, supra, 803 F.2d at 1510.

27

particularly his noticeable change in attitude constitute the
"more" of which the Supreme Court spoke in <u>Bostick</u> and properly
could be considered suspicious by Officer Kobayashi.  For
example, in <u>United States v. Riley</u>, 927 F.2d 1045, 1046 (8th Cir.
1991), the facts were that:

> [t]he detectives told [Riley] that they were working
> narcotics, and asked him if he was carrying any drugs.
> Riley said no, and consented to a search of his person,
> briefcase, and initially, to his check-in luggage.  He
> became increasingly nervous, however, as the discussion
> shifted to the check-in luggage.  When it appeared that the
> detectives could actually retrieve the suitcase, Riley
> withdrew permission to search it and told them he wanted to
> leave immediately.

On this issue, the Eighth Circuit held that among the factors
properly giving rise to reasonable suspicion to detain was that
"Riley exhibited a sharp change in attitude, from being compliant
and agreeable at the outset of the encounter with the detectives
to becoming nervous and guarded when they pressed for permission
to search his checked suitcase".  927 F.2d at 1050.  Likewise in
<u>United States v. Alpert</u>, 816 F.2d 958, 959 (4th Cir. 1987), the
police officer had:

> . . . asked for permission to search Albert and his
> briefcase.  Albert declined to consent, falling backwards,
> and commenced to sweat heavily.  Sweat was coming through
> his shirt and beaded on his forehead.

The Fourth Circuit relied upon defendant's aforesaid non-verbal
conduct to affirm the lower court's ruling that there was

reasonable suspicion to detain.  And lastly, in <u>United States v.</u> <u>Simmons</u>, 918 F.2d 476, 481 (5th Cir. 1990), the Fifth Circuit observed:

> Simmons and Agent Davis looked on as Agent Simone searched [co-defendant] Roser.  <u>When Simmons saw that cocaine had</u> <u>been recovered from Roser's jacket, he became extremely</u> <u>nervous, he stepped back against the wall, he zipped up his</u> <u>ski jacket, and he crossed his arms tightly across his</u> <u>chest</u>.  Under these circumstances, Agent Davis, who witnessed the entire course of events had probable cause to search Simmons.

> [emphasis added].

Likewise herein, defendant's aforesaid actions and reactions to Officer Kobayashi's expressed interest in his pickup truck would reasonably establish that: (i) the CI's tip that defendant was transporting illegal drugs from the mainland was correct; and (ii) that defendant had had the opportunity to place those drugs in his pickup truck after re-positioning the vehicle in the airport parking lot (i.e., his five minute "sit" in the truck); and (iii) it was more likely than not that these drugs were still located in defendant's pickup truck.

It is true, as the Officers later found out after defendant had been initially detained, that the narcotics detector dog canine did not alert on the pickup truck.  However, under the totality of circumstances herein, this reasonably would not negate either Officer Kobayashi or Agent Jones' belief, based upon the other facts related above, that defendant's pickup truck contained illegal drugs.  Furthermore, the theory underlying how

29

and why narcotics detector dogs can detect controlled substances, that is to say, by being trained to alert to their distinctive odors, is undisputed and common knowledge.  See, e.g., United States v. $22,474.00, 246 F.3d 1212 (9th Cir. 2001)(". . . the dog was trained to, and would only, alert to the odor of a chemical by-product of cocaine called methyl benzoate").  It consequently is understandable why both Officers Kobayashi and Jones believed that there was a reasonable explanation for why the canine did not alert, namely, that there had been insufficient time for the drug's odor to diffuse to the vehicle's exterior.

For the foregoing reasons, Officer Kobayashi and Agent Jones believed that they had the requisite probable cause basis to apply for a search warrant for the truck.  The Officers' actions of "going the extra mile" to seek a warrant were entirely commendable and demonstrate their professionalism and desire to insure full compliance with all of defendant's Constitutional rights.  However, as a matter of Federal law, a search warrant was not necessary under the circumstances herein and a warrantless search of defendant's truck-- whose scope would have been to the same extent as actually carried out herein and resulted in the recovery of the methamphetamine-- was permissible.

30

VI.    **CONCLUSION**

      Based upon the foregoing, defendant's suppression motion should be denied in its entirety.

      DATED: Honolulu, Hawaii, January 24, 2006.

                        EDWARD H. KUBO, JR.
                        United States Attorney


                  By <u>/s/Michael K. Kawahara</u>
                     MICHAEL K. KAWAHARA
                     Assistant U.S. Attorney

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on the date and by the method of service noted below, a true and correct copy of the foregoing was served on the following at her last known address:

Served by First Class Mail:

        Ms. Pamela E. Tamashiro                    January 24, 2006
        Attorney at Law
        707 Richards St., PH 7
        Honolulu, HI 96813


                            <u>/s/ Rowena N. Kang</u>