IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CR. NO. 05-00362 JMS |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | ORDER DENYING DEFENDANT'S |
| ) | MOTION TO SUPPRESS |
| MICHAEL NIELSEN, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

Defendant Michael Nielsen seeks an order from the court suppressing evidence obtained as a result of a search of his truck. On February 16, 2006, the court received oral testimony from Drug Enforcement Administration (DEA) Special Agent Jason Alznauer, DEA Special Agent Richard Jones, Honolulu Police Department (HPD) Task Force Officer Christopher Kobayashi, HPD Task Force Officer Wendy Nakasone, and Defendant Michael Nielsen. After reviewing the motion, the supporting and opposing memoranda, the testimony of the witnesses, and the arguments of counsel, the court DENIES the motion to suppress.

//

//

I. BACKGROUND

Special Agent Jason Alznauer provided credible testimony concerning information obtained about Michael Nielsen from a confidential informant (CI). On April 25, 2005, the CI informed Alznauer that, the following day, Nielsen would be traveling from Honolulu to Los Angeles in order to purchase methamphetamine and then return to Honolulu with couriers body-carrying the purchased methamphetamine. The CI also told Alznauer that Nielsen would fly to Los Angeles with currency to purchase the drugs. On April 26, 2005, Alznauer observed Nielsen and two other individuals at the Honolulu International Airport purchase airline tickets and proceed to security. At the airport security checkpoint, Transportation Security Administration (TSA) officers uncovered a large amount of currency – totaling $27,000 – on Nielsen and his two traveling companions. Nielsen himself was carrying approximately $11,000 in currency. The TSA officers contacted members of the Airport Task Force, including Officer Christopher Kobayashi. Kobayashi questioned Nielsen and his companions, but the money was not seized and no arrests were made. On April 29, 2005, after Nielsen's plane departed from Los Angeles, the CI informed Alznauer that Nielsen was returning to Honolulu from Los Angeles and might be carrying methamphetamine that he purchased in Los Angeles.

Kobayashi encountered Nielsen at the airport on April 29, 2005. During the encounter, Nielsen informed Kobayashi that he had purchased two cars while in Los Angeles and provided Kobayashi with records of the sales. Nielsen consented to a search of his bags; however, Kobayashi did not find a prosecutable amount of drugs.[1] The CI later informed Alznauer that Nielsen had become nervous after his encounter with TSA officers on April 26 and, consequently, Nielsen decided not to carry the methamphetamine he purchased back to Honolulu on his person. The CI told Alznauer that another courier would bring the drugs back to Hawaii. Alznauer was never able to verify whether Nielsen purchased methamphetamine while he was in Los Angeles or whether a courier successfully brought the alleged drugs into Hawaii.

On August 10, 2005, the CI told Alznauer that Nielsen had gone to California again to purchase methamphetamine. The CI stated that Nielsen had purchased the drugs but had not yet found a courier for the trip back to Honolulu. The following day, the CI informed Alznauer that Nielsen was on a flight from California to Honolulu and that Nielsen was carrying methamphetamine taped

---

[1] Alznauer testified that officers found a small amount of what appeared to be methamphetamine loose in Nielsen's shaving kit. Alznauer stated that the officers did not find a enough drugs to support a federal prosecution and that the drugs were confiscated for destruction. Nielsen was not arrested.

near his groin area.[2]  The CI stated that Nielsen was returning to Honolulu for his brother's sentencing hearing in federal court.[3]  According to the CI, Nielsen had been unable to find a courier for the drugs and decided to carry them back to Honolulu himself.

      The CI also informed Alznauer that Nielsen had parked his truck in the airport's inter-island parking area before leaving for California.  The CI described the truck as a green pickup truck with license plate number BU 226.  Prior to Nielsen's arrival, Kobayashi located a truck matching the CI's description parked in the inter-island parking lot.  Kobayashi informed Special Agent Richard Jones of the location of the truck.

      Once Nielsen's plane arrived, Kobayashi observed Nielsen deplane and followed him through the terminal.  Kobayashi had previously learned from Jones, who contacted the airline, that Nielsen had checked two pieces of luggage on the flight.  Kobayashi observed Nielsen walk past the baggage claim area, head directly for the inter-island lot, and enter the green truck and drive away.

---

[2] Alznauer testified that, at the time the CI told him that Nielsen was returning to Honolulu, Nielsen's flight was already in the air. The CI told Alznauer that Nielsen was on an ATA Airlines flight.

[3] Alznauer testified to, and the court took judicial notice of, the fact that Mark Nielsen's sentencing was scheduled at 3:00 PM on August 11, 2005 before Judge Helen Gillmor and that the sentencing took place on that date.  Alznauer also testified that Mark Nielsen and Michael Nielsen are brothers.

Kobayashi radioed this information to Jones, who then observed Nielsen pull into the main parking terminal near the baggage claim area for his flight. Jones testified that Nielsen parked his truck and then spent approximately five minutes inside the truck before returning to the baggage claim area. Although Jones could not see what Nielsen was doing in his truck, he described Nielsen as talking on his cell phone and "fidgeting." Jones stayed with the parked truck while Kobayashi and Task Force Officer Nakasone picked up the surveillance of Nielsen in the baggage claim area.

   Kobayashi testified that he and Nakasone encountered Nielsen in the baggage claim area while Nielsen was waiting for his bags. Prior to the bags arriving, Kobayashi approached Nielsen and asked to speak with him. Kobayashi identified himself as a police officer and stated that Nielsen was not under arrest and was not in any trouble. Kobayashi then asked Nielsen if he remembered him from the incident on April 26, 2005 when TSA officers stopped Nielsen and his companions with $27,000 in cash. Nielsen said that he remembered Kobayashi and agreed to speak with him. Both the government and Nielsen have characterized this exchange as a consensual encounter.

   Once Nielsen retrieved his bags from the baggage carousel,

Kobayashi asked Nielsen if he could search the bags.[4] Nielsen agreed to allow Kobayashi and Nakasone to search his luggage. Kobayashi testified that he found clothing and car parts in Nielsen's bags, but did not find contraband. He testified that each bag was heavy, weighing approximately thirty pounds, and that he thought Nielsen might have moved his truck in order to make it easier to move his heavy bags to the truck.

After searching Nielsen's checked bags, Kobayashi asked Nielsen how he would be getting home from the airport. Nielsen gave conflicting answers; according to Kobayashi, Nielsen first stated that his mother was picking him up and then stated that he would catch a taxi. Kobayashi testified that Nielsen then asked for directions to the nearest taxi stand. Kobayashi then told Nielsen that he would direct him to a taxi stand. Nielsen then placed a cell phone call during which he addressed the party he was calling as "mom" and stated that he did not need a ride from the airport. During his conversation with Kobayashi, Nielsen did not mention his truck parked in the main parking lot.

Kobayashi did not find Nielsen's explanations regarding his transportation credible. Kobayashi and Nakasone continued following Nielsen to

---

[4] Kobayashi also testified that a narcotics-detecting dog sniffed Nielsen's two checked bags before the bags were placed on the conveyer belt to the baggage carousel. The dog did not alert to the bags.

the taxi stand and Kobayashi related what he had observed during the encounter with Nielsen to Jones over the radio. Kobayashi then reported to Jones that Nielsen tried to flag down a taxi. Jones instructed Kobayashi to detain Nielsen. Kobayashi asked Nielsen to pick up his bags and step away from the roadway. Nielsen asked if he was being detained and Kobayashi responded that he was.

Once Nielsen was detained, Kobayashi stated that he knew Nielsen's truck was parked nearby. Nielsen responded that he needed a car to pick up his mother for his brother's sentencing. Kobayashi then asked Nielsen if he could search the truck. Nielsen responded by saying "fuck you, you're not searching my truck." Kobayashi testified that Nielsen's demeanor changed after Kobayashi asked about the truck. Both Kobayashi and Nakasone testified that Nielsen appeared nervous; his hands began to shake, he was sweating, and his face became flushed.

Kobayashi then stated, within earshot of Nielsen, that he was going to start preparing a search warrant for Nielsen's truck. Kobayashi proceeded to Nielsen's truck with Officer Nakamura, who was nearby with a narcotics-detecting dog. The canine examined the exterior of the truck and did not alert to the presence of narcotics. The negative result of canine sniff did not alter Kobayashi's suspicions regarding the truck; Kobayashi believed that Nielsen had placed drugs

in the truck when he moved it to the main parking area and that the odor from the drugs had not yet permeated the truck such that the dog would alert.

  While Kobayashi observed the canine examination of the truck, Nakasone remained with Nielsen near the taxi stand. Nakasone testified that she made small talk with Nielsen in order to keep him calm. At one point in their conversation, Nielsen asked how long the officers were going to take. Nakasone responded that it would depend on how much time the officers needed to do their job, which included "get -- working on a search warrant" for Nielsen's truck. Nielsen then stated that the officers could search his truck as long as he could be present at the search. Nakasone radioed to Jones that Nielsen had given consent to search as long as he could be present.

  Jones testified that, after he received the radio communication from Nakasone, he went to the taxi stand area to talk with Nielsen about his decision to give consent. Jones testified that he asked Nielsen why he had changed his mind about consenting to search the truck. Nielsen stated again that the officers could search his truck as long as he was present. Jones asked Nielsen why he wanted to be present and Nielsen stated that he was concerned the officers would tear up his truck. Jones assured Nielsen that the officers would not tear up his truck and asked if they could search the truck without him present if they promised not to

damage the truck. Nielsen agreed. Jones asked Nielsen for the key to his truck and Nielsen gave him the key.

Jones and other agents subsequently searched Nielsen's truck and discovered five bags of methamphetamine under the passenger seat. Jones testified that Nielsen never renewed his request to be present during the search.

Nielsen testified that he did not consent to the search of his truck.[5] Nielsen's version of events is substantially similar to the officers' versions up to the point when Nakasone and Jones testified that Nielsen changed his mind and consented to the search of his truck. Nielsen testified that he did call his mother on his cell phone and tell her that he would get a taxi and meet her at the courthouse for his brother's sentencing. Nielsen testified he never told Nakasone that he changed his mind; rather, Jones came back to speak with him and asked to search his luggage again. Nielsen says that he consented. As Jones was searching one of Nielsen's bags, he discovered a tool that was sealed in its packaging with a zip tie. Jones asked if Nielsen had a knife to open the zip tie and Nielsen said he did not. Nielsen contends that Jones grabbed his keys from him and used the keys

---

[5] Nielsen testified that he was familiar with law enforcement techniques but he claims that he did not know he had the right to refuse consent to search. Nielsen nonetheless admitted that when initially asked if agents could search his truck, he responded, "fuck you guys, you're not searching my truck."

to open the zip tie. Nielsen testified that he attempted to remove the key to his truck from his key ring before Jones took the keys, but that Jones said removing truck key was not necessary.

After searching the box containing the tool, Nielsen testified that Jones asked again why Nielsen would not let them search the truck. Nielsen stated that the only thing he had in his truck was black pearls[6] and that if Jones gave him his keys back, Nielsen would go to his truck and retrieve the pearls for the officers. Nielsen testified that Jones refused to return the keys and instead left with other agents to open and search Nielsen's truck.

Notwithstanding Nielsen's testimony to the contrary, the court finds that Nakasone and Jones both testified credibly that Nielsen changed his mind and allowed the officers to search his truck.

## II. ANALYSIS

Nielsen argues that the evidence obtained from the search of his truck should be suppressed because the search was conducted without a warrant in violation of the Fourth Amendment. Nielsen contends that he did not consent to the search of his truck and that the officers lacked probable cause to search without his consent.

---

[6] Nielsen testified that he was unsure if the possession of black pearls was legal.

The court concludes that Nielsen voluntarily consented to the search of his truck. The court further concludes that the officers had probable cause to search Nielsen's truck absent his consent and without a warrant.

## A.    Nielsen Voluntarily Consented to the Search of his Truck

Voluntary consent to search constitutes a waiver of Fourth Amendment rights. *Schneckloth v. Bustamonte*, 412 U.S. 218, 235 (1973). Thus, the government may search upon an individual's voluntary consent without a warrant and without probable cause and any evidence discovered may be seized and admitted at trial. Because the court credits the testimony of the law enforcement officers that Nielsen did in fact consent to the search of his truck, the only issue that remains is whether that consent was voluntary.

Courts examine the totality of the circumstances surrounding the consent to determine whether it was given voluntarily. *Id.* at 227. The Ninth Circuit has identified the following five factors that courts should consider when determining whether consent to search was voluntary: "'(1) whether defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether Miranda warnings were given; (4) whether the defendant was notified that she had a right not to consent; and (5) whether the defendant had been told a search warrant could be obtained.'" *United States v. Soriano*, 361 F.3d 494, 502

(9th Cir. 2004) (quoting *United States v. Jones*, 286 F.3d 1146, 1152 (9th Cir 2002)). Each case of consent should be examined on its own facts and no one factor is determinative of the issue of voluntariness. *Id.*

  First, Nielsen was detained when he gave consent to search his truck. Though his interaction with Kobayashi and Nakasone started as a consensual encounter, the encounter turned into a detention when Kobayashi instructed Nielsen to step away from the taxi stand; Nielsen asked if he was being detained and Kobayashi responded that he was. Shortly thereafter, Kobayashi asked to search the truck.

  The circumstances of Nielsen's seizure, however, do not indicate that the situation was unduly coercive. The officers had reasonable suspicion[7] to detain Nielsen, they did not draw their weapons (the second factor that the court considers), and they did not place Nielsen in handcuffs. *Cf. United States v. Chan-Jimenez*, 125 F.3d 1324 (9th Cir. 1997) (finding consent not voluntary when defendant was stopped without reasonable suspicion and officer kept his hand on his revolver at all times). The testimony demonstrated that the officers were not threatening to Nielsen. Moreover, though the officers did not initially inform Nielsen that he had a right to refuse consent (the fourth factor), Nielsen was aware

---

[7] The court discusses the officer's suspicion below in section B.

of his rights.  When Kobayashi asked to search his truck, Nielsen's initial answer was an emphatic "no."  A prior refusal to consent demonstrates that Nielsen knew that he had a right to refuse, "a knowledge that is highly relevant in our analysis of whether consent is voluntary."  *United States v. Meza-Corrales*, 183 F.3d 1116, 1125 (9th Cir. 1999).  The events prior to Nielsen giving his consent to search similarly demonstrate a lack of coercion.   After Nielsen refused consent, none of the officers attempted to get him to change his position.  When he did change his mind, he was engaging in casual conversation with Nakasone who was asking him about his job and answering his questions regarding how long the other officers would take to investigate his truck.  In short, the officers did not overbear Nielsen's will.

       As to the third factor under the voluntariness inquiry, the officers did not give Nielsen a *Miranda* warning.  This factor is inapposite, however, when the defendant is not under arrest and *Miranda* rights have not attached.  *Soriano*, 361 F.3d at 504. Notwithstanding the lack of *Miranda* warning, the officers were careful to ensure that Nielsen had voluntarily changed his mind about giving consent. When Jones learned from Nakasone that Nielsen had decided to give consent, Jones came to speak with Nielsen before searching the truck.  He asked Nielsen why he changed his mind and informed him that it was his decision

whether to give consent. Jones also reassured Nielsen that the agents would not damage his truck and obtained permission to search without Nielsen's presence.

Finally, the court considers that Kobayashi stated to another officer, within a few feet of Nielsen, that Kobayashi was going to obtain a search warrant for Nielsen's truck. Nielsen overheard this statement, as Kobayashi surely knew he would. In addition, Nakasone reiterated that the officers were "get -- working on a search warrant" when Nielsen asked how long he would be detained. Under the fifth factor of the voluntariness inquiry, courts are generally less likely to find that consent is voluntary when the request is presented as an ultimatum: give us consent or we *will* obtain a warrant. *See Id.* at 504. No such ultimatum was made to Nielsen. In addition, the fifth factor is significantly diminished because, as discussed below in section B, the officers had probable cause to search Nielsen's truck. *Id.* at 505-06 ("[W]hen probable cause to justify a warrant exists, the weight of the fifth factor is significantly diminished."); *United States v. Kaplan*, 895 F.2d 618, 622 (9th Cir. 1990) ("[C]onsent is not likely to be held invalid where an officer tells a defendant that he could obtain a search warrant if the officer had probable cause upon which a warrant could issue.").

After weighing each of the five factors laid out by the Ninth Circuit, the court finds that Nielsen voluntarily consented to the search of his truck. The

14

officers did not exercise undue force or coercion when they detained Nielsen and requested his consent. Nielsen knew that he could refuse consent because he initially told the officers that he would not allow them to search his truck. Though the officers indicated to Nielsen that they could get a search warrant for the truck, they did, in fact, have probable cause to search the vehicle. Nothing indicates that Nielsen's will was overborne or that his consent was anything but voluntary.

The court now turns to the issue of probable cause.

**B.    The Officers Had Probable Cause To Search Nielsen's Truck**

Even if Nielsen's consent was not voluntary, the officers had probable cause to search Nielsen's truck, and could do so without a warrant, pursuant to the automobile exception to the warrant requirement.

"The Fourth Amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment--subject only to a few specifically established and well-delineated exceptions.'" *Mincey v. Arizona*, 437 U.S. 385, 390 (1978) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).

One such exception – the "automobile exception" – allows for a warrantless search of an automobile so long as "there is probable cause to believe

that the car contains articles that the officers are entitled to seize." *Chambers v. Maroney*, 399 U.S. 42, 48 (1970). *See also Maryland v. Dyson*, 527 U.S. 465, 466 (1999) (per curiam) ("The Fourth Amendment generally requires police to secure a warrant before conducting a search. As we recognized nearly 75 years ago . . . , there is an exception to this requirement for searches of vehicles." (Citations omitted.)); *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) (per curiam) ("If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment thus permits police to search the vehicle without more.").

        The Supreme Court's landmark decision, *Illinois v. Gates*, 462 U.S. 213 (1983), "marked a return to the 'totality of the circumstances' test [for probable cause] and emphasized that probable cause means 'fair probability,' not certainty or even a preponderance of the evidence." *United States v. Gourde*, No. 03-30262, slip op. 2357, 2366 (9th Cir. Mar. 9, 2006) (en banc) (quoting *Gates*, 462 U.S at 246). Thus, probable cause to search a vehicle exists "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found[.]" *Ornelas v. United States*, 517 U.S. 690, 696 (1996).

        In the instant case, a CI, who had previously provided the officers with reliable information related to Nielsen's trip to Los Angeles in April,

informed the officers that Nielsen was flying into Honolulu International Airport on August 11, 2005 and that he would be carrying methamphetamine on his person. The CI provided the officers with detailed information regarding Nielsen's trip. The CI knew that Nielsen was returning for his brother's sentencing and stated that Nielsen had not been able to find a courier for his drugs and was therefore bringing the drugs back himself this time. The CI also described the appearance, location, and license plate number of Nielsen's truck such that the officers were able to locate the vehicle in the inter-island parking lot.

The officers' surveillance of Nielsen at the airport focused their suspicions on this truck. The officers observed Nielsen deplane and head directly for his truck in the inter-island parking lot. They observed him move the truck to the main parking terminal and then remain in the truck for five minutes, while "fidgeting" and speaking on the cell phone, before returning to the baggage claim area. At this point the officers were suspicious that, if Nielsen was carrying drugs on his person as the CI indicated, he may have stashed the drugs in his truck. The officers were also aware of an obvious innocent explanation: Nielsen may have been moving his truck in order to make it easier to carry his bags from the baggage claim area.

Kobayashi's conversation with Nielsen in the baggage claim area

only increased the officers' suspicions regarding the five minutes Nielsen spent in his truck. When asked how he would get home from the airport, Nielsen gave conflicting stories. Kobayashi credibly testified that Nielsen first stated that his mother was picking him up, but immediately thereafter said that he was taking a taxi. In an apparent attempt to cover for this inconsistency, he placed a call on his cell phone and, in a loud voice addressed to "mom," stated that he did not need a ride.[8] Not only were Nielsen's conflicting stories themselves suspicious, but they negated the innocent explanation for why he had gone directly to his truck after exiting the airplane; Nielsen had clearly not moved his truck in order to get closer to the baggage claim. His actions made it clear that he did not want the officers to know that his truck was parked nearby.

After detaining[9] Nielsen at the taxi stand, Kobayashi confronted Nielsen about the truck. Nielsen's demeanor suddenly changed; he became visibly nervous and hostile toward the officers.

---

[8] Nielsen testified that he telephoned his mother to tell her that he would take a taxi to the courthouse. No explanation was provided as to why Nielsen would take a taxi to the courthouse when his own truck was parked at the airport.

[9] Based on Nielsen's suspicious conduct, the officers had reasonable suspicion to believe that "criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 30 (1968). Specifically, the officers had reasonable suspicion to believe that Nielsen was attempting to flee because he had just hidden narcotics in his truck. Thus, the officers' decision to detain him did not violate the Fourth Amendment. *Id.*

At this point, the police had the following information: (1) a CI, who had provided reliable information in the past, stated that Nielsen would be body-carrying methamphetamine into Honolulu International Airport; (2) after getting off the plane, Nielsen headed directly to his truck and spent five minute in the vehicle before going to baggage claim; (3) Nielsen gave conflicting stories to the officers regarding how he was leaving the airport in an apparent attempt to conceal his truck from them; and (4) Nielsen immediately grew nervous and hostile when the officers confronted him with their knowledge that his truck was parked nearby. There was at least a fair probability that the officers would find narcotics in Nielsen's truck and thus they had probable cause to search the truck.[10]  Pursuant to the automobile exception to the warrant requirement, the officers did not need to obtain a warrant before searching the vehicle.  Accordingly, all evidence seized from Nielsen's truck is admissible at trial.

//

//

//

---

[10] The fact that a narcotics detecting-dog subsequently examined the truck and did not alert to the presence of drugs does not undermine the court's conclusion that the officers had probable cause to search the vehicle.  Taking into account the totality of the circumstances, including the dog's failure to alert, the court concludes that there was a fair probability that the officers would find drugs in Nielsen's truck.

## III.  CONCLUSION

For the reasons stated herein, the defendant's motion to suppress is DENIED.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, March 13, 2006.



_____
J. Michael Seabright
United States District Judge

*United Stated v. Nielsen*, Cr. No. 05-00362 JMS, Order Denying Defendant's Motion to Suppress